Argument for Appellant.

[Filed March 31, 1886.]

# EUGENE D. WHITE *v.* COMMISSIONERS OF MULTNOMAH COUNTY.

CONSTITUTIONAL LAW—REGISTRY LAW—SUFFRAGE AND ELECTIONS.—Under the constitution of this state, every law which requires previous registry as a prerequisite to the right to vote is *ipso facto* void.

SAME.—The right to vote is a vested right *in præsenti* to be exercised *in futuro* on a fixed day, and laws requiring previous registration in order to exercise the right on the day do not merely prescribe a rule of procedure, but impose an additional substantive requirement.

INJUNCTION—TAX-PAYER MAY MAINTAIN AGAINST COUNTY OFFICERS.—A tax-payer may maintain a suit to enjoin county officers from expending county funds in the execution of a void law. (*Carmen* v. *Woodruff*, 11 Or. 133.) THAYER, J., dissenting.

MULTNOMAH COUNTY.   Plaintiff appeals.   Reversed, and injunction made perpetual.

*T. A. McBride, W. D. Fenton, and John Burnett,* for Appellant.

The registry provided for can confer no constitutional right upon the elector, and it is only the evidence of the possession of such right. No act can legally provide that this shall be the only evidence of that right, or that the evidence or proof of the right to vote can only be offered during a limited and arbitrary time, many months or weeks preceding the day when this constitutional right is to be exercised. (*Commonwealth* v. *Maxwell*, 27 Pa. St. 444; *Page* v. *Allen*, 58 Id. 351; *Patterson* v. *Barlow*, 60 Id. 54—see dissenting opinion, Judges Sharswood and Thompson; *Dells* v. *Kennedy*, 49 Wis. 555; *Daggett* v. *Hudson*, 3 N. E. Rep. 538, Ohio; *Perry* v. *Whitaker*, 71 N. C. 475; *Capen* v. *Foster*, 23 Am. Dec. 642, note.) The registry law of the state of Iowa allows a voter whose name does not appear on the register to offer proof on the day of election that he is a qualified elector;

hence the law has been upheld as a reasonable regulation merely. (*Edmunds* v. *Banbury*, 28 Iowa, 267.) In the case of *State* v. *Butts*, 31 Kan. 554, which upheld the Kansas registry law, the provisions of that law are seen to be wholly different from ours. The provisions of this act concerning ballots are an unreasonable exercise of the power to regulate elections, and the authorities and textwriters sustain the proposition that such provisions are invalid as tending to impose unusual conditions upon the free exercise of the right of suffrage, and as tending to destroy the absolute and desired freedom and secrecy of the ballot. (*Williams* v. *Stein*, 38 Ind. 89; *People* v. *Pease*, 27 N. Y. 45; Cooley's Const. Lim. 604; *People* v. *Cicott*, 16 Mich. 283; *Temple* v. *Mead*, 4 Vt. 535; *State* v. *Hilenantel*, 23 Wis. 422.)

*Joseph Simon* and *John M. Gearin*, for Respondents.

It is manifest that although the qualifications of electors or representatives were prescribed by the constitution, without a provision of law for regulating the exercise of that right, the constitution itself would be nugatory. It cannot be doubted that the act in question is a just exercise of the power of the legislature to provide for an exercise of one of the most important rights of suffrage. (*Capin* v. *Foster*, 12 Pick. 488; S. C., 23 Am. Dec. 632; *Edmunds* v. *Banbury*, 28 Iowa, 267; *Auld* v. *Walton*, 12 La. Ann. 129; *Harris* v. *Whitcombe*, 4 Gray, 433; *Huggill* v. *Lewis*, 28 Eng. L. & Eq. 326; *State* v. *Butts*, 31 Kan. 537; *Davis* v. *School District*, 44 N. H. 398.) It is no restriction upon the right itself that men should be asked to furnish evidence of it. And with this understanding of registration laws they have been repeatedly passed and pronounced constitutional. (*Byler* v. *Asher*, 47 Ill. 101; *Edmunds* v. *Banbury*, 28 Iowa, 267; *Auld* v. *Walton*, 12 La. Ann. 129; *Hyde* v. *Brush*, 34 Conn. 454; *State* v.

*Baker*, 38 Wis. 71; *Patterson* v. *Barlow*, 60 Pa. St. 54; *Monroe* v. *Collins*, 17 Ohio St. 665.)   The great weight of authority outside of the state of Ohio, and since the decision of *Capen* v. *Foster, supra*, has been in accordance with the decision in that case.   Two of the cases quoted on the other side are *Dell* v. *Kennedy*, 49 Wis. 555, and *Page* v. *Allen*, 58 Pa. St. 338.   The latter court, having in the mean time changed two of its judges, in the subsequent year, in the case of *Patterson* v. *Barlow*, 60 Id. 55, again by a divided court, reversed the decision in *Page* v. *Allen, supra*.   The Supreme Court of Ohio, in the recent case of *Daggett* v. *Hudson*, Reporter, Jan. 6, 1886, seem to have held that a registration law which did not make provision for permitting electors to cast their ballots even up to the day of election, although not registered, was unconstitutional.   This is clearly opposed to the weight of authority.

WALDO, C. J.   This suit is brought to determine the constitutionality of the late act providing for the registration of voters.   The constitution of Oregon (art. 2, sec. 2) provides:

"In all elections not otherwise provided for by this constitution, every white male citizen of the United States of the age of twenty-one years and upwards who shall have resided in the state during the six months immediately preceding such election, and every white male of foreign birth of the age of twenty-one years and upwards who shall have resided in this state during the six months immediately preceding such election, and shall have declared his intention to become a citizen of the United States one year preceding such election, conformably to the laws of the United States on the subject of naturalization, shall be entitled to vote at all elections authorized by law."

The counsel for the plaintiff pointed out in detail the extraordinary provisions of the law. The district attorney for the fifth judicial district, as a sample of the workings of the law, explained how he would be deprived of his vote by the mere fact of necessary absence from Clackamas County during the period of registration in attending to his official duties in other counties in his district. We find it unnecessary, however, to enter into an examination of the details of the act, for it is met at the threshold by a fatal objection. As we construe the constitution, every law which requires previous registry as a prerequisite to the right to vote is *ipso facto* void. The legislature would have the power by implication, had it not been expressly conferred to prescribe the manner of regulating and conducting elections; but the right to vote itself has been placed beyond their interference or control. This fact seems to have been forgotten in framing the act. And how different apparently was the framers' conception of the important nature of the right from that of Lord Holt, nearly 200 years ago, a judge who was never accused of being recreant to the liberties of Englishmen: "That a right which a man has to give his vote at the election of a person to represent him in parliament, there to concur in the making of laws which are to him his liberty and property, is a most transcendent thing, and of a high nature." (*Ashby* v. *White*, 2 Ld. Raym. 953.) If the attention were not permitted to wander beyond the act itself, the thought would hardly occur that the legislature were dealing with a right vested in the citizen by the constitution—a right of which "no department of the government, nor all of them combined," said the court in *State* v. *Adams*, 2 Stew. 239, "have the power to divest an individual, otherwise than is prescribed by the constitution." So in *Brown* v. *Hummel*, 6 Pa. St. 86, Coulter, J., said: "The

most important of all our franchises—the right of an elector and citizen—cannot, in a confined sense, be called property. It is not assets to pay debts, nor does it descend to the heir or administrator. But who does not feel its value, and who but would turn pale if he thought he could be deprived of it, without hearing or trial, by act of assembly?"

Important, however, as the question may be, we approach its consideration without solicitude other than an anxiety to understand and declare the law of the land. That inveterate argument, the gravity of declaring an act of the legislature unconstitutional, was urged as usual in such cases. If, however, a law be unconstitutional, the gravity of not declaring it to be so is also worthy of consideration. Our constitutions are "written securities of liberty," as Chief Justice Ruffin has expressed it. That sound and able judge, Mr. Justice Campbell, of Michigan, well said in *Sears* v. *Cottrell*, 5 Mich. 283, that "every unconstitutional law which is made to stand creates a permanent and deadly evil by overturning the only safeguards we have against public usurpation." The judiciary, as the guardians of the people's constitutional liberties, must, in duty, observe that vigilance against constitutional encroachment which is said to be the price of liberty. The rules of law are beyond the control of those who are merely to declare what the law is. In every case the gravity consists in ascertaining what the law is. A text of the famous Littleton has come down to us in the Year Books (Y. B. 6th ed. 4, 8, pl. 18): *Le ley est tout un en griend et meind*—"the law is all one, in great things and small."

The right to vote under the constitution is a vested constitutional right. "When I say a right is vested, I mean that he has the power to do certain actions, or to possess certain things, according to the law of the land."

(Chase, J., *Calder* v. *Bull,* 3 Dall. 394.) If the right be vested by the constitution, it denotes a right that cannot, under the constitution, be taken away. (*Rich* v. *Flanders,* 39 N. H. 385; *Eakin* v. *Raub,* 12 Serg. & R. 360.) It would seem that every case, from *Capen* v. *Foster,* 12 Pick. 485, S. C., 23 Am. Dec. 632, down, which has sustained against similar objections the constitutionality of a registry law which requires previous registry as a prerequisite to the right to vote, has taken it for granted that such laws were mere rules of procedure. It was assumed in *Capen* v. *Foster, supra,* that the right to make investigations into the qualifications of voters necessarily implies the right to compel the voter to furnish previous proof of his qualifications; that such a law was but "a reasonable and convenient regulation of the mode of exercising the right of voting." It was placed on the same footing with a law which required the voter to offer his vote in writing. Now, voting *viva voce* or by ballot is a pure rule of procedure. So are laws regulating polling-places, and the times for opening and closing the polls. He who takes a check to a bank to cash it must indorse it. He who pays money is entitled to a receipt. This is procedure. But if a contract be to pay money on a fixed day, a subsequent law requiring the payee to give ten days' notice of the time and place of payment, or no obligation to pay shall arise, affects the substance of the contract, and is void. It is conceived that laws are of like nature which require previous registry in order to vote. Where the right is secured by the constitution, such laws, having merely a legislative sanction, are void.

The true view of this question seems to be that stated in *State* v. *Baker,* 38 Wis. 86—that where registry is required as a prerequisite to the right to vote, such registry is a condition precedent to the right itself, and

therefore a rule or substantive law. This principle was subsequently practically applied in *Dells* v. *Kennedy,* 49 Id. 555, in which a registry law of Wisconsin was held to be void. It results as follows: A "right" has been defined by Mr. Justice Holmes to be the legal consequence which attaches to certain facts. (The Common Law, 214). Every fact which forms one of the group of facts of which the right is the legal consequence appertains to the substance of the right. The right to vote under the constitution may be defined to be a vested right *in præsenti,* to be exercised *in futuro,* on a fixed day. When that day arrives, and the right is to be exercised, every fact essential to the existence of the right is a substantive fact. Previous registry, in order to vote, is precisely such a fact. It is a condition precedent which must be performed, or when the day arrives no right will exist. Procedure *ex vi termini* appertains to the mode of enjoyment or enforcement of a right. No rule of procedure can operate anterior to the time when the right is to be enjoyed or enforced. It cannot have effect to determine a right before the right accrues. The distinction, therefore, sought to be drawn on this subject between what constitutes a qualification, and what, in contradistinction, is called a mode of proof of qualification, is unsubstantial.

We may say of the attempted distinction, in the words of a chief justice of England centuries ago: "Therefore we must take off this vail and cover of words, which make a show of something, and in truth are nothing." "Every definition of the qualification of voters," said Mr. Drake, the author of the Law of Attachment, arguing in *Blair* v. *Ridgely,* 41 Mo. 163, "is but a statement of the terms on which men may vote; and in every instance such definitions refer to what a party has done as well as to what he is. They say to the voter: 'If you

have done certain things, you can vote.' " He who does not register is not qualified to vote, and hence is not a " qualified elector "—a phrase that is used five times in the constitution to signify those who are entitled to go to the polls on election day and legally vote. (See *Byrne* v. *State*, 12 Wis. 578; *Sanford* v. *Prentice*, 28 Id. 363.) But under this act, he who goes to the polls on election day, possessing every constitutional qualification, may find that the legislature has stepped in between him and the constitution. He finds his vote denied because he has not done something which the legislature has required him to do. He discovers that he is not a qualified elector, and yet he is told that his omission to do the act which had effect to disqualify him, is not itself a disqualification; or if he have performed the act, that his performance does not constitute a qualification. This will not square with the logic of facts. The distinction between what is substantive and what is modal is confounded. He who has a right to something to-morrow can never be secure of his right before to-morrow comes. If this can result, then the constitution does not mean what it says.

*McGafferty* v. *Guyer*, 59 Pa. St. 111, very aptly says:

"Can the legislature, then, take away from an elector his right to vote while he possesses all the qualifications required by the constitution? This is the question now before us. When the citizen goes to the polls on election day with the constitution in his hand, and presents it as giving him a right to vote, can he be told: 'True, you have every qualification that instrument requires; it declares you entitled to the right of an elector; but an act of assembly forbids your vote, and therefore it cannot be received.' If so, the legislature is superior to the organic law of the state; and the legislature, instead of being controlled by it, may mold the constitution at their pleasure. Such is not the law."

And so must we say in this case.

Where a constitution provides, as does that of New York, "that laws shall be made for ascertaining by proper proofs the citizens who shall be entitled to the right of suffrage," the power to pass a registry law seems fully implied. (See *United States* v. *Quinn,* 8 Blatchf. 59.) The case of *State* v. *Butts,* 31 Kan. 554, was grounded on a like constitutional clause. The difference between those cases and the present is the difference between a case where a power has been conferred and a case where it has not. So, on the other hand, a question can never arise under a constitution like that of Texas, which has declared in unequivocal terms that "no law shall ever be enacted requiring a registration of the voters of this state." (See *United States* v. *Slater,* 4 Woods, 358.) The right of the plaintiff to maintain this suit is set at rest by the decision of this court in *Carman* v. *Woodruff,* 10 Or. 133. The opinion cites, with many other cases, *Page* v. *Allen,* 58 Pa. St. 338, which presented this very case.

The decree must be reversed, and the court below directed to make the injunction perpetual.

LORD, J. Tested by the rule laid down in *Capen* v. *Foster, supra,* the features of the act objected to are in conflict with the provision of our constitution conferring the right of suffrage. Whether these objectionable features could be obviated by further legislation, it is not necessary now to decide. It is sufficient to say that the act as enacted cannot be sustained as to that part excepted to.

THAYER, J. (dissenting). The appellant filed a complaint in the court below to restrain the respondents, as county judge and commissioners of said county, from auditing and allowing certain bills against their county

incurred in the execption of the law known as the "Registry Law," claiming that said law was unconstitutional, and that, unless restrained, the respondent would audit and allow claims to the amount of several hundred dollars of such bills. The complaint alleged that the appellant was a citizen of, and a legal voter and tax-payer in, said county and state, and that the execution of said law as threatened by the respondents would prove of great injury to the public and to the appellant. The respondents filed a demurrer to the complaint, which was *pro forma* sustained by the court, and the appeal is taken from the decision thereon.

It is apparent that the suit was begun for the purpose of obtaining the opinion of this court as to the validity of said law. Counsel upon both sides seemed to be conscious at the hearing that the court might view the matter in that light, and were particular to insist that the court had full cognizance of the case; but it seems to me that if we attempt to consider its constitutionality under these proceedings our determination would be extrajudicial. This court ought not to pass upon so important a question unless the litigation is genuine, and the plaintiff in the suit shows, by his allegations, that he has a right to have it decided. He should allege facts showing that he was liable to suffer a special injury, and that he was entitled to invoke an equitable remedy to prevent it. The question of the legality of the act known as the "Registry Law" is of great importance to the people of the state, yet I cannot reconcile myself to the notion that we should undertake to determine it unless a proper case is presented for our consideration. I cannot perceive that the appellant has any standing to raise the question. He is one of the public, it is true, and a tax-payer, but the execution of the act referred to will not affect him any more than any other tax-payer. If he wants to test

the legality of it, he can do so, probably, by neglecting to register in accordance with its provisions, and offering his vote on election day.   Then, if the judges refuse to receive his vote, he can maintain an action against them for such refusal, provided the registration act is unconstitutional.   Whether it is unconstitutional or not depends upon whether it is inconsistent with the privileges secured by the constitution to the citizens.   The constitution of the state provides fully the qualifications for voters.

"In all elections not otherwise provided for by this constitution, every male citizen of the United States, of the age of twenty-one years and upwards, who shall have resided in the state during the six months immediately preceding such election, and every male of foreign birth, of the age of twenty-one years and upwards, who shall have resided in this state during the six months immediately preceding such election, conformably to the laws of the United States on the subject of naturalization, shall be entitled to vote at all elections authorized by law."   (Const., sec. 2, art. 1.)

And section 17, article 2, of that instrument, provides where they shall vote, viz.:

"In the election precinct in the county in which they may reside, for county officers, and in any county in the state, for state officers, or in any county of a congressional district in which such elector may reside, for members of congress."

The legislature cannot add any other or different qualifications than these; but it is required to enact laws to support the privilege of free suffrage; prescribe the manner of regulating and conducting elections; and prohibit, under adequate penalties, all undue influence therein from power, bribery, tumult, and other improper conduct.   (Const., sec. 8, art. 2.)   And counsel for the appellant make no question in this case but

that the legislature has the right to adopt a registry law
for the purpose of ascertaining the qualifications of per-
sons claiming the right to vote, but· they object to this
act or acts (there are three or four of them, including
amendments), for the following reasons: 1. The act im-
pairs the right of suffrage; 2. The act is an unrea-
sonable exercise of the power to regulate the elective
franchise; 3. The act destroys the right of suffrage, and·
absolutely denies the right to an unknown number of
legal voters; 4. The act provides for and requires po-
litical tests as qualifications for the officers who execute
the law; 5. The act prohibits any elector from voting
any ballot except one obtained from a committee of a
political party, and punishes, in effect, the independent
or non-partisan voter; 6. The act, in effect, prohibits
the supervisory control over congressional elections pro-
vided for by sections 2005, 2011–2014, 2016–2019, 2021,
et seq., R. S. U. S., and in effect denies to citizens of the
United States privileges and immunities conferred by
these laws.

The attempt to adopt any law upon the subject seems
to have been attended by a series of blunders. The
main act, which was approved February 24, 1885, pro-
vided for holding a general election on the first Monday
of June, 1885, and made it the duty of the judges and
clerks of the election to meet at the usual place of voting
in their precinct on the first Monday in March preced-
ing each general election for the purpose of registering
"voters" in said precinct. It was afterwards discovered
that the general election could not be had until the first
Monday in June of 1886. A special session of the legis-
lature was convened to correct it, and for other purposes,
and an amendment, approved November 24, 1885, was
adopted to cure theerror. Subsequently, the legislature
adopted another amendment, approved November 25,

1885, in which it was provided that the judges and clerks of election should meet on the first Monday in April preceding each general election for the purpose of registering "votes," and amending the original act in other particulars.    Thereafter, and on the thirtieth of November, 1885, the legislature adopted a sort of supplemental act, entitled "An act for a uniform system of books and certificates, to be used in the registration of voters and elections, as laid down in an act entitled," etc., including the title of the original act, approved February 24, 1885, which contained rules and instructions for judges and clerks of election; but in providing therefor, it was provided that on the first Monday in March preceding each general election the judges and clerks should meet for the registration of voters.    This provision, however, related to the instruction that should be contained in a certain book called " The Precinct Register."

By a close inspection of the act, it will, I think, be discovered that the legislature did not intend to change the time for the meeting of the judges and clerks back to the first Monday of March, but it provided an instruction which would require them to meet at the latter time. It was evidently a mistake in that respect.    The intention of the legislature, no doubt, was to have the instruction conform to the act as amended November 25, 1885. It is a misfortune that the effort to adopt so commendable a law should have been attended with so many mishaps, as they tend very much to prejudice it with the community, and deprive it of that support so essential to the maintenance of legislative enactments.

The main grounds upon which the act is claimed to be unconstitutional are that the length of time allowed voters in which to register is unreasonably short, and that there is no provision for allowing voters to vote for

state officers and members of congress outside of the precinct in which they reside. The amended act of November 25, 1885, provides that the judges of election shall organize by electing one of their number as chairman; that they shall meet at nine o'clock in the forenoon, and continue until five o'clock in the afternoon; that they may adjourn one hour at noon; that they shall continue said session for three days. Section 13 of the original act provides that in case of sickness or absence from the precinct, etc., of any qualified elector during the time the judges are sitting to register voters, such elector may apply to the chairman of the board of judges; and on making satisfactory proof that the said applicant is a qualified voter of said precinct, and that said applicant was sick or necessarily absent from said precinct during the time said board was sitting to register voters, the said chairman may register the name of the applicant on the register in his possession, and issue to him the required certificate; but such application, by section 14 of the act as amended, cannot be made after the twenty-fifth day of April preceding the general election.

It is contended that the regulation is not reasonable, because the right to register is not continued until the day of the election. I suppose the legislature deemed the three days' session of the board as sufficiently long to enable the voters in the precinct to register, and that the provision for those who were sick, or absent therefrom, as ample time to enable them to do so, and conceding that the legislature has the right to require such registration prior to the time of the election, it has the right to judge as to what would be a reasonable time for the purpose. Whether it has judged correctly or not will be ascertained by the practical working of the law. A person would naturally suppose that the voters of a precinct could all register in three days as well as all vote in one.

They certainly would do so if they attached that importance to the elective franchise that good citizens should. This law will doubtless subject many citizens to considerable inconvenience, but they had much better submit to that than have their voice stifled by the admission to the privilege of a horde of lawless mercenaries and repeaters. The citizen's duty is not fully discharged when he has deposited his ballot; he should attend to it that no spurious or illegal vote counteracting the effect of his own be cast. Elections are but a travesty where every vagabond may vote without restraint. It is no privilege to vote when an irresponsible wretch can be imported to vote, or hired to repeat his vote. Elections may as well be turned over to the hoodlum element of the community to manage and control, if citizens are unwilling and refuse to submit to the inconvenience a registry law imposes.

The reasoning of the court in *Daggett* v. *Hudson*, 3 N. E. Rep. 538, to my mind, is puerile. It is to the effect that the legislature may adopt a registry act, but it must not incommode the legal voter. The steamboat man, the student, and the commercial traveler must not be required to attend and have his name registered as a voter prior to the time of exercising the right to vote, for the reason, in effect, that the steamboat might lose a trip, the student a lesson, and the commercial traveler the opportunity of making a sale of merchandise to a customer, the consequences of which, according to such logic, would outweigh the necessity of preserving the purity of the ballot-box and the efficiency of government. If any one is able to discover a hardship in requiring a citizen to attend once in two years at the polling-place in the precinct where he resides to be registered as a voter, and that a regulation is unreasonable which requires him to do that as a prerequisite to his voting at an election, in order to prevent

fraudulent voting, and elections from becoming a farce, is exceedingly critical. That it is an inconvenience no one will deny; but who would not endure that in preference to having elections, at which persons are selected to administer the affairs of the government, made a mockery and be the subject of ridicule? The claim that the right to register should be continued down to the day of voting, in order to make the regulation reasonable, would destroy the whole efficiency of it. There is an object and purpose in such a law. It is intended to prevent illegal voting. This cannot be accomplished unless the names of voters are enrolled a length of time before the election, so that they can be inspected, and it be ascertained whether they have the requisite qualifications or not. If it is left until the day of the election, when they can rush in pell-mell, and roll under their tongue "as a sweet morsel" a false oath regarding their qualifications as an elector, it would be an idle, useless performance, and the community would be as well off without it.

There are some provisions in the act which require construction. The form of oath, when a voter is challenged, should be adapted to the circumstances under which the vote is offered. The legislature did not, evidently, intend that the voter should swear that he was a resident of the county and precinct where he offered his vote when he only proposes to vote for state officers or congressman, and the requirement that he has been for the last ninety days an actual resident of the county cannot be enforced at all. The constitution makes no provision that the voter should have been a resident in the county for the ninety days. It requires that he shall vote in the election precinct in the county in which he resides for county officers. This ninety-day provision, however, was in the old law, and the legislature has continued it in this. It is an extra requirement that cannot

be enforced, but does not affect the validity of the new law any more than it did the old one.

Counsel for the appellant seemed to imagine that there were many features in the law that would operate oppressively. But I fail to discover how they are liable to, with a fair and intelligent administration of its provisions. It has just come from the hands of the legislature —has not been tried, nor should thus early be condemned. If the people will take hold of it as patriotic citizens ought to of a measure that so vitally concerns their welfare, it will, I believe, be found to be a great blessing. The system of fraudulent voting that has been inaugurated in some parts of this state, and affects every part of it, is as certain to retard and ruin its prosperity as vice is certain to result in misery. It is the violation of the moral law; and that it will be attended with fearful consequences is as sure as the violation of the organic law is to produce disease and death.

The appellant has attempted to impose upon the court a very delicate duty. He asks the court to determine that the act of a co-ordinate branch of the government is a nullity. This ought never to be done unless the legislature has clearly overstepped its authority. It would certainly present an anomalous condition of affairs if the relief sought herein were granted. Representatives chosen by the people, constituting the legislative branch of the government, meet at the capitol of the state in February, 1885, and enact a form of law to ascertain the qualification of persons claiming to be electors, and requiring the names of those found to possess the requisite qualification to be registered, and a certificate issued to them that they are qualified to vote. The act is duly approved by the governor of the state, but it is subsequently observed that in consequence of some clerical error, perhaps, the act will be ineffectual. The legislature

is again convened, and proceeds by amendment to perfect it. The amendments are also approved by the governor, and included among the laws of the state. But before the time has arrived for the execution of any of its material provisions, and before the ink with which it was written has fairly dried, parties rush into court to have it nullified. The courts have important functions to perform, but they are not autocratic tribunals. They have no authority to say to the people that they shall not have the benefit of a law their representatives have made for them, presumably in accordance with their wishes. Courts are instituted to administer the law, not to unmake it. They may question its validity when it infringes upon the right of a person which they are called upon in a suitable proceeding to protect. The legality of any enactment may be drawn in question incidentally, but it would be highly improper for them to attempt to exercise a veto power upon legislative proceedings. That would be as unconstitutional as the legislative enactment could possibly be.

In *Patterson* v. *Barlow*, 60 Pa. St. 54, a similar question was brought before that court by a suit similar to the one in this case. Judge Agnew, in delivering the opinion of the court, said that the defendants denied the standing of the plaintiffs as proper parties, and the jurisdiction of the court over the subject; but that in view of the danger to the peace and quiet of the people if the constitutionality of the law should be left in uncertainty, the court would pass by the question of standing and jurisdiction in order to reach the all-important one upon the validity of the law. The learned judge suggested, however, that in passing them by the court did not mean it to be inferred that it had not grave doubts of the right of the plaintiffs to represent the public, and of its own jurisdiction to enjoin against one of the

political systems of the state in its entire scope because of the invalidity of some of its provisions; that the court doubted the right of the plaintiffs to call for an injunction beyond that portion of the law which they, as private citizens, could show to be injurious to their own rights; and that it was more than doubtful how far, as private citizens, they could impugn the law in its public aspects, and ask the court to restrain its execution on public grounds; that the system there referred to was the only one to regulate elections intended by the legislature to be left in force, all laws supplied by it, and all inconsistent with it, being expressly repealed. It was further suggested that if the court, as a court of equity, could lay its hands on the whole system because of the illegality of some of its parts, it could, on the eve of any election, arrest the entire political machinery of the commonwealth which is set in motion by a general election.

In view of the said suggestions, the opinion of the court regarding the merits of the case must have been *ex gratia*, and such necessarily will be the character of any opinion as to the validity of the act in question we may express in this case. There is no party before the court who has the right to require us to determine as to its validity. What relief could a court of equity grant the appellant in his suit? What "bills" would it interdict the County Court from auditing? What restrain could it place upon that tribunal? What functions would it decree should not be exercised by the county judge and commissioners sitting to transact county business? Should it say to them that a certain enactment of the legislative assembly was void, and inhibit them from administering its provisions? A common-law writ of prohibition could not have been sued out for any such purpose. It could only be resorted to against judicial

encroachments. It lay to prevent inferior courts from exceeding their jurisdiction. An injunction may be granted to restrain the unlawful acts of public officers when they would produce irreparable injury, or create a cloud upon title, or when such remedy is necessary to prevent a multiplicity of suits. Upon those grounds the imposition or enforcement of illegal taxes may be enjoined at the suit of a tax-payer. There, however, the party's estate is directly affected. The immediate object of the act is to impose a charge upon it. School laws, highway laws, laws incorporating towns, and police laws, generally, have the effect to create a public expense; but who ever supposed that a party, because he was liable to be affected thereby, could have the officers charged with the execution of such laws enjoined from enforcing their provisions upon the grounds of their supposed invalidity? If such a rule is to obtain, it ought to be extended far enough to include the legislature itself.

I am of the opinion that the registry act in question is not unconstitutional; that the legislature has power to provide the mode it has in order to ascertain who are qualified electors under the constitution; and that the provisions of the act are not so unreasonable as necessarily to deprive voters from the exercise of the right of suffrage; but I do not consider my opinion in the case, in the condition it is before the court, as any more authoritative than if it were delivered on the street informally. I do not believe that a citizen at large can require the courts to inquire into the constitutionality of a legislative enactment until he is hurt by it, or there is imminent danger of his receiving special injury from its threatened enforcement.

The complaint herein should be dismissed.