Argued March 7, decided April 24, 1905.

### BRIX *r.* CLATSOP COUNTY.

80 Pac. 650.

COUNTIES—CONTRACT CREATING A DEBT.

A contract by a county for the construction of a court house by which the county agrees to issue warrants to the contractors to the amount of the contract price, payable only out of a fund to be created by levying a special tax for a series of years, creates a debt against the county, within the meaning of Const. Or. Art. XI, § 10, limiting the power of counties to "create any debts or liabilities" exceeding a stated amount.

From Clatsop: THOMAS A. McBRIDE, Judge.

Suit by Asmus Brix and others against Clatsop County and others to restrain the drawing and delivering of certain county warrants, and to obtain the cancellation of a contract made by the county for the construction of a court house. A demurrer to the complaint was sustained pro forma, and plaintiffs appeal.    REVERSED.

For appellants there was a brief over the name of *Noland & Smith,* with an oral argument by *Mr. George Noland.*

For respondents there was an oral argument by *Mr. Harrison Allen,* District Attorney, *Mr. Charles H. Carey* and *Mr. George Clyde Fulton,* with a brief to this effect.

The gravity and great importance of the principle involved in this case, not alone to the people of Clatsop County, but to the people of the State of Oregon, cannot be too earnestly and carefully considered. Whether or not the county of Clatsop shall or not build for itself a court house may be of great importance to its inhabitants, yet whether it succeeds or fails, sinks into utter insignificance when compared with the great principle involved in this appeal. For whether this court shall follow those courts which have adopted what is known as the rule of liberal construction, or those courts which have heretofore and still cling to the doctrine of strict construction, the decision of this court upon the controlling principle involved in this suit will either stay to an immeasurable extent the great commercial interests of our state, and practically prohibit the construction of public buildings, public improvements, public parks, and the beautifying of public grounds, for many years to come, or will point out to our enterprising citizens a legitimate, prudent and practical manner of providing the present inhabitants with substantial public buildings, parks and improvements, without violating the provisions of our constitution, which is being done every day. This court, as now organized, has been forced to say to honest contractors who have in good faith furnished materials and performed labor, and built large and beautiful structures, for municipal corporations in this state, at an expenditure of many thousands of dollars, that, although the municipalities received the benefit of such labor and materials, yet because they could not lawfully create debts, the contractors must suffer the loss alone; but, to the credit of this court, in each instance where it has been compelled to perform this painful duty, it has pointed out a safe, practical and legal method whereby public improvements may be built regardless of cost, namely, by levying a special tax and providing a special fund into which all collections of such special levy shall be deposited for the purpose of paying for such improvement: 33 Or. 358, 43 Or. 476.

We realize that by a certain school of jurists, because of the peculiar construction of their minds, or by reason of their associates and early teachings, the contrary doctrine is held, and that

courts dominated by strict constructionists deny the doctrine which we urge in his case. Yet we submit, in all due respect to the honesty, ability and patriotism of these jurists, that the coming century will have seen the last of the adherents to these pernicious doctrines. And it should be so when it is remembered that the very existence of this government is due solely to the great doctrine of liberal construction advanced by Webster, John Marshall, Bushrod Washington, Story and their followers. Had the doctrine of strict construction been adhered to, the history of this great nation would have been closed at the rendition of the decision in the Dartmouth College case.

The constitution of this state, as well as that of the United States, keeps step with the wheels of progress, it expands as the great and growing industries of the nation expand. Were it possible for the framers of the Constitution of the United States to reassemble in this year, Anno Domini, 1905, they would be aghast at the construction placed upon it by John Marshall and his followers. Yet the history of this nation amply vindicates the doctrines of this great school. The question of internal improvements in this state is one of the utmost importance. Modern and sightly structures are desirable for many reasons, not only on account of the beauty of the architecture, their convenience and safety, but because such structures add stability to the communities where located, and are incentives to our citizens to build better and more substantial structures. The plan adopted by the act in question meets with the approval of an overwhelming weight of all authorities, and practically the unanimous approval of all modern authorities.

I. We submit with great confidence that by the execution of the contract set forth in plaintiff's complaint between Clatsop County and Hastie & Dugan to build the court house in question, and the building thereof under such contract, and the issuance and delivery of the warrants provided for therein, no debt is created within the inhibition of the state constitution: *Eaton* v. *Mimnaugh,* 43 Or. 465 (73 Pac. 754) ; *Brockway* v. *Roseburg,* 46 Or. 77 (79 Pac. 335) ; *Grant* v. *Davenport,* 36 Iowa, 396 ; *Burlington Waterworks* v. *Woodward,* 49 Iowa, 58 ; *Creston Water-*

[15—46 Or.]

*works* v. *Creston,* 101 Iowa, 687 (70 N. W. 739); *Witter* v. *Board of Supervisors,* 112 Iowa, 380 (83 N. W. 1041); *Swanson* v. *City of Ottumwa,* 118 Iowa, 161 (91 N. W. 1048, 59 L. R. A. 620); *State ex rel.* v. *Mayor,* 19 Mont. 518 (49 Pac. 15); *City of Galveston* v. *Heald,* 54 Tex. 420; *Weston* v. *City of Syracuse,* 17 N. Y. 110; *Strieb* v. *Cox,* 111 Ind. 299 (12 N. E. 481); *Board* v. *Hill,* 115 Ind. 316 (16 N. E. 156); *Quill* v. *Indianapolis,* 124 Ind. 292 (7 L. R. A. 681, 23 N. E. 738); *City of Albany* v. *McCullouch,* 127 Ind. 500, 505 (26 N. E. 1076); *City of La Porte* v. *Gamewell F. Tel. Co.* 146 Ind. 466 (45 N. E. 588, 58 Am. St. Rep. 359, 35 L. R. A. 686); *Board of Commissioners* v. *Harrell,* 147 Ind. 500 (46 N. E. 124); *Smilie* v. *Fresno County,* 112 Cal. 311 (44 Pac. 356); *People ex rel.* v. *May,* 9 Colo. 404 (12 Pac. 838); *Hockaday* v. *County Com'rs.* 1 Colo. App. 362 (29 Pac. 287).

II. The entire act forms a part of the contract to erect and complete the court house building. The conclusion therefore can not be escaped that one so contracting is bound by its terms, and can have no claim against the county on a warrant issued against such fund until a sufficient sum of money shall be paid into it, which, computing the warrants in the order issued, shall be sufficient to satisfy such warrant, and, should the tax be insufficient to pay any such warrant, the holder can have no action against the county, but is utterly remediless in the premises: Const. Or. Art. IX, § 3; *Northup* v. *Hoyt,* 31 Or. 524 (49 Pac. 754); *Cook* v. *Putman,* 70 Mo. 668; *Moody* v. *Cass County,* 85 Mo. 479; *Mitchell* v. *Spears,* 39 Ga. 56; *Hospital* v. *Higgins,* 15 Ill. 185; *Hornthall* v. *Commissioners,* 126 N. C. 26 (35 S. E. 191); *City of La Porte* v. *Gamewell Fire Alarm Tel. Co.* 146 Ind. 466 (58 Am. St. Rep. 359, 35 L. R. A. 686, 45 N. E. 588).

III. The act in question provides that the proceeds of the tax collected, levied by virtue thereof, shall be devoted exclusively to the erection, completion and furnishing of a court house. This is a legislative appropriation of the funds created thereby: *Hockaday* v. *Commissioners,* 1 Colo. App. 362 (29 Pac. 287). In any event the levy of the tax would itself be an appropriation: *Durith* v. *Buxton,* 63 Ark. 397 (39 S. W. 56).

· IV. Whatever doubts may have existed in the past, it is now the rule, recognized by all courts, that a county or municipal corporation, even though indebted to its constitutional limit, may make valid appropriations of its revenue in anticipation of the collection thereof, and that the power in regard to special taxes for special purposes is not confined to the current year, but to taxes to be collected from year to year through a series of years: *Municipal Sec. Co.* v. *Baker County,* 33 Or. 338, 347 (54 Pac. 174) ; *Eaton* v. *Mimnaugh,* 43 Or. 465 (73 Pac. 754) ; *City of Springfield* v. *Edwards,* 84 Ill. 626; *Law* v. *People,* 87 Ill. 400; *Fuller* v. *Heath,* 89 Ill. 296; *Koppikus* v. *State,* 16 Cal. 253; *People* v. *Pacheco,* 27 Cal. 204; *Smilie* v. *Fresno County,* 112 Cal. 311 (44 Pac. 356) ; *Grant* v. *City of Davenport,* 36 Iowa, 396, 399; *Witter* v. *Board,* 112 Iowa, 380 (83 N. W. 1041) ; *Swanson* v. *Ottumwa,* 118 Iowa, 161 (91 N. W. 1048, 59 L. R. A. 620) ; *People ex rel.* v. *May,* 9 Colo. 404 (12 Pac. 838).

MR. JUSTICE BEAN delivered the opinion of the court.

In June and October, 1904, Clatsop County made contracts with the defendants Hastie & Dugan, to furnish the materials and labor necessary for the construction, according to certain plans and specifications, of a court house for $116,200.30. After a part of the work had been performed, the contractors refused to proceed further because of a doubt as to the validity of their contract, due to the fact that the county was in debt at the time it was made in excess of the constitutional limit. At the recent session of the legislature an act was passed (Laws 1905, chap. 6, p. 64,) authorizing the levy of a special tax upon all the taxable property of the county, to be continued through a series of years, for the purpose of "purchasing, erecting, building and furnishing a court house." Section 1 of this act provides that the county court, at its January term, 1905, shall levy a tax of not to exceed five mills on the dollar on all the taxable property in the county, · to continue through a series of years to be determined by the court, for the purpose of constructing a court house; that the order of the court shall specify the amount of the levy, the number of years the tax is to run, and the purpose for which it is levied, and thereafter without further order, the levy shall be held good and

valid, and shall be extended on the assessment roll and collected in the same manner that all other taxes are extended and collected, each and every year therafter, until the full series of years designated shall have expired; that the money arising therefrom shall be kept separate and apart from other funds, and be known as the "Court House Fund." By section 2 the county court is authorized to purchase from the former contractors and the architect their interests in the building designed as a court house, and pay therefor, in warrants on the fund to be derived from the special tax, an amount equal to the warrants theretofore issued to them on account of such building, and to contract for the completion and furnishing of the partially constructed building so purchased in accordance with the plans and specifications already adopted or such as might thereafter be approved by the court, but payment thereof should be made only in warrants on the special fund. Section 3 requires the county court to recall and cancel all outstanding warrants theretofore issued on account of the construction of the building. Section 4 declares that the contract for the completion and furnishing of the building shall provide that payment therefor shall be made only with money to be collected and placed in the special court house fund, and that no part of the contract price shall be held to be an indebtedness against the county or become due or payable until sufficient money shall be collected by the special tax to pay the warrants drawn against the same, and that the act authorizing the levy and the making of the contract shall be a part of such contract. Section 5 provides that no warrants shall be drawn on such special fund except by order of the county court for the construction, completion or furnishing of the court house, and that such warrants shall not be paid from any other fund and no money from any other source shall ever be transferred to such fund. Section 6 requires the county treasurer to keep the money received on the special tax separate and apart from other funds, and to pay it out only on warrants issued by the county court on account of the construction of the court house. Section 7 declares that no part of the purchase price of the interests of the former contractors or architect in the uncompleted building, or any part

of the contract price for the completion or furnishing of the court house, shall be held to be an indebtedness against the county.

The act contained an emergency clause and was filed in the office of the Secretary of State January 27, 1905. Immediately thereafter the county court, in pursuance of the authority thus attempted to be conferred upon it, made an order levying a special tax of five mills on the dollar on all the taxable property in the county, to continue through a series of 15 years, commencing with the year 1905 and ending with the year 1919, for the purpose of purchasing, erecting, building and furnishing a court house. It also purchased of the contractors and architect their interests in the uncompleted building, and entered into a contract with the defendants Hastie & Dugan for the completion thereof for the sum of $103,800.30, to be paid only in warrants on the special fund arising from such tax. It was stipulated in the contract that the warrants issued in payment for the building should be accepted in full satisfaction of any and all claims against the county arising out of the contract, and that they would look solely to the special fund for the payment thereof. At the time the tax was levied and the contract made, the county was in debt more than $70,000 over and above the amount permitted by the constitution, and it is claimed and alleged by the plaintiffs that by reason of such fact the contract was and is void.

The constitution provides that no county shall create any debts or liabilities which shall singly or in the aggregate exceed the sum of $5,000, except to suppress insurrection or repel invasion: Const. Or. Art. XI, § 10. A debt or liability incurred for the construction of a court house is within the provision of the constitution, and, if incurred in violation thereof, is void: *Eaton* v. *Mimnaugh,* 43 Or. 465 (73 Pac. 754). If, therefore, the contract in question created a debt or liability against the county, it is void. That the act of 1905 authorizing the levy of the special tax and the making of the contract for the construction of the court house was designed and intended to enable the county to avoid the provisions of the constitution is apparent. The position of the defendants is that such a result was successfully accom-

plished, and no debt or liability was created against the county by the contract for the construction of the court house, because a special tax to continue for 15 years, to provide a fund for the payment of the contract price, was levied prior to the making of the contract, and such contract contained a stipulation that the cost of the building should be paid only from such special fund.

There are decisions of able and respectable courts holding that when, at the time a contract presently to become due, is made by a county or a municipality, a fund is on hand and appropriated to its payment, or a fund such as current taxes has been provided, but is uncollected, or an appropriation is made of the future income of a revenue producing property belonging to the municipality, such as waterworks and the like, and the contract is expressly made payable only out of such funds or revenue, with no recourse on the municipality, it does not create a debt or liability against the corporation, within the meaning of constitutional or charter limitations similar to those contained in our constitution: *People ex rel.* v. *May,* 9 Colo. 404 (12 Pac. 838) ; *City of Springfield* v. *Edwards,* 84 Ill. 626; *Law* v. *People,* 87 Ill. 385; *Fuller* v. *Heath,* 89 Ill. 296; *Winston* v. *Spokane,* 12 Wash. 524 (41 Pac. 888) ; *Faulkner* v. *Seattle,* 19 Wash. 320 (53 Pac. 365) ; *Dively* v. *City of Cedar Falls,* 27 Iowa, 227; *Grant* v. *City of Davenport,* 36 Iowa, 396; *Doon Township* v. *Cummins,* 142 U. S. 366 (12 Sup. Ct. 220, 35 L. Ed. 1044). This doctrine rests upon the theory (to use the language of one of the decisions cited) that the contract amounts, in effect, to "an assignment pro tanto, without recourse, by the county of the fund," or (to use that of another) "one thing is simply given and accepted in exchange for another." In such case the transaction is deemed closed on the part of the municipality when the warrant or order on the special fund is issued and accepted, thereby leaving no further liability or obligation, either absolute or contingent, against it, whereby its debt may be increased. But to have this effect, it seems obvious to us, there must be at the time the contract is made a fund belonging to the municipality, having either an actual or a potential exist-

ence, concerning which the parties may contract. Otherwise there is nothing to assign or exchange. The assessment and collection of a tax on the property of the inhabitants of a municipality in the future, for the benefit of a particular individual, and in payment of an obligation incurred by the municipal authorities, necessarily, it seems to us, implies a debt or liability against the municipality which the holder is entitled to have paid with money derived from taxation. The constitution plainly prohibits a county from contracting debts or liabilities which singly or in the aggregate shall exceed $5,000, except for a specific purpose. A contract by it to pay a certain sum of money in the future, with interest, out of money to be thereafter raised by general taxation from all the people, whether the levy be made at one time, covering that future, or has to be made yearly, is manifestly a debt or liability against the municipality; and no technical process of reasoning, legal acumen, or jugglery of words can make the fact otherwise. The moment an obligation to pay money is voluntarily incurred by a municipality with no funds or assets in its treasury, nor current funds or revenue collected or in process of collection, for the payment of the same, that moment such obligation must be considered in determining its indebtedness, however carefully the law or the contract under or by which it was incurred may attempt to shift the burden from the corporate entity to the taxpayers. To hold otherwise would be to make an unwarranted distinction between the taxpayers in their organized capacity and the same persons as individuals. In the payment of obligations incurred by the officers of a municipal corporation from money raised by taxation, there is no room for a distinction between the corporation itself and the taxpayers. The money must come from the taxpayers, whatever may be the language of the law authorizing its exaction, or of the contract providing for its payment, and the constitution cannot be avoided by providing a special tax to be levied in advance for a series of years, and making such contract payable alone therefrom: *Hodges* v. *Crowley,* 186 Ill. 305 (57 N. E. 889).

Stripped of all subterfuge, the act of the legislature authorizing the defendant county to levy a special tax for court house purposes, and the contract made by it in pursuance thereof, are an attempt to permit the county, although already in debt largely beyond the constitutional limit, to impose an additional indebtedness of over $100,000 upon its taxpayers, by attempting to make a distinction between the county as a corporate entity and the individual taxpayers. If this may be done for the construction of a court house, it may be done for highways, bridges, poor farms, hospitals, jails, and the like corporate expenses, and the property of the taxpayers may thus be burdened for years to come, contrary to the provisions and spirit of the constitution. It would not be particularly comforting to a taxpayer so situated to be told, while groaning under such special levies, extending hopelessly into the future, that he could congratulate himself that he lived in a county which was not indebted more than $5,000. The reasoning which results in such a conclusion is to us unsound. The constitution was intended to protect the taxpayers. Its language is plain and unambiguous, and the court is not justified in giving it a strained or astute interpretation to avoid individual or local hardship. It is its duty to enforce the provisions as written, according to their plain and obvious meaning, and not to permit it to be circumvented by shifting the burden of a debt from the municipal entity to the taxpayers. *Swanson* v. *City of Ottumwa,* 118 Iowa, 161 (91 N. W. 1048, 59 L. R. A. 620), is contrary to this view; but the question decided in that case arose about the same time in a case pending in the circuit court of appeals, and was there decided adversely to that of the Iowa court: *Ottumwa* v. *City Water Co.* 119 Fed. 315 (56 C. C. A. 219, 59 L. R. A. 604). The opinion in the latter case, written by Judge LOCHREN, was concurred in by Judges SANBORN and THAYER, and is a clear, able and convincing decision, and seems to us a more logical, reasonable, and safe one than that of the Iowa court.

The decree of the court below is therefore reversed, and one will be entered here as prayed for in the complaint.

REVERSED.