Argued and submitted September 11, alternative writ of mandamus dismissed
December 4, 1989, reconsideration denied January 11, 1990

## STATE ex rel KANE,
*Plaintiff-Relator,*

*v.*

## GOLDSCHMIDT et al,
*Defendants.*

(SC S36443)

783 P2d 988

Henry Kane, Beaverton, argued the cause and submitted the briefs *pro se.*

Michael D. Reynolds, Assistant Solicitor General, Salem, argued the cause for defendants. With him on the briefs were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General and Robert W. Muir, William F. Nessly, Jr., and Linda Rodgers, Assistant Attorneys General, Salem.

PETERSON, C. J.

## PETERSON, C. J.

This is an original proceeding in mandamus filed after the Legislative Assembly enacted Oregon Laws 1989, chapter 1032 (chapter 1032). The plaintiff seeks (1) to have the law declared unconstitutional and (2) to halt proposed government action thereunder. The plaintiff seeks a peremptory writ of mandamus directing the defendants to "halt actions and expenditures to implement" chapter 1032 and "not to execute" any contracts thereunder, and to "stop implementation of ORS 276.009, 276.429 and 276.218 to the extent that any proposed contract or agreement calls for the state * * * to make payments after expiration of the biennium in which the debt was incurred."

Many states, including Oregon, have constitutions and statutes that prohibit incurring debt. The Oregon constitutional provision at issue here, Article XI, section 7 (quoted in part B below), prohibits the legislature from creating debt exceeding, in the aggregate, $50,000. Such constitutional limitations have led many state and local governments to create a variety of financing arrangements in an attempt to avoid the constitutional restrictions.

This case involves the constitutionality of a 1989 law that contains provisions for purchase contracts that include a nonappropriation clause. Our decision is:

1. The plaintiff has standing to bring this mandamus action.

2. Chapter 1032, as we interpret it in this opinion, does not violate Article XI, section 7.

3. Financing agreements made under chapter 1032 are constitutionally permissible, but security interests granted to the lender or trustee are subject to the limitation that, upon nonpayment, the trustee or lender can recover secured property only to the extent of the unpaid balance at the time of nonpayment.

We dismiss the alternative writ of mandamus.

### A. SUMMARY OF LEGISLATION

Chapter 1032 authorizes the Director of the Department of General Services, upon the approval of the State

Treasurer and the Executive Department, to enter into certain financing agreements. A financing agreement is defined in Section 1(4) as a "lease purchase agreement, an installment sale agreement, a loan agreement, or any other agreement to finance real or personal property which is or will be owned and operated by the state or any of its agencies, or to refinance previously executed financing agreements." These financing agreements may take the form of certificates of participation or other long-term financing. Section 3(1).

The statute requires that payments under the financing agreements be made solely from "available funds," defined as "funds appropriated or otherwise made available by the Legislative Assembly to pay amounts due under a financing agreement for the fiscal period in which the payments are due." (Section 2(1) and Section 1(1).) Section 2(1) provides that "[i]n no circumstances shall the state be obligated to pay amounts due from any source other than available funds. If there are insufficient available funds to pay amounts due * * *, the lender may exercise any property rights which the state has granted to it in the financing agreement against the property which was purchased with the proceeds of the financing agreement * * *." These include: (1) repossession of personal property in which the lender or trustee has a security interest by reason of the acquisition, improvement, or refinancing of property with the proceeds of a financing statement; (2) receiving monies that may be in the hands of a private trustee;[1] and (3) evict the state from the possession of real property for the term of a real property lease if the state fails to pay when due the amount scheduled to be paid under a financing agreement or otherwise defaults under a financing agreement (Section 3(5).)[2]

Another law, Oregon Laws 1989, chapter 731, authorizes the making of financing agreements or certificates of participation under chapter 1032 totalling $172,000,000.

---

[1] Section 3(1) of chapter 1032 provides that the Director of the Department of General Services, with the approval of the State Treasurer, may "[e]nter into agreements with trustees to hold financing agreement proceeds, payments and reserves as security for lenders * * *."

[2] Section 3(5) authorizes the state to lease its real property to the trustee or lender, and apparently the state would sublease from the trustee or lender. See Part F below.

## B. CONTENTIONS OF THE PARTIES

Article XI, section 7, of the Oregon Constitution provides in part:

"The Legislative Assembly shall not lend the credit of the state nor in any manner create any debt or liabilities which shall singly or in the aggregate with previous debts or liabilities exceed the sum of fifty thousand dollars * * *."

The plaintiff contends that chapter 1032 authorizes the creation of "debt" within the meaning of and in violation of Article XI, section 7, of the Oregon Constitution. He argues that the state does not currently hold unappropriated or surplus funds sufficient to pay the financing agreements and certificates of participation. Accordingly the plaintiff contends that the proposed actions pursuant to chapter 1032 violate the constitutional debt limit, because they place the general fund, and thus the taxpayer, at risk. He asserts that the provisions of the statute obligating the state to make payments only from the available funds appropriated by the legislature are a subterfuge and that the statute and implementing agreements create, in substance if not in name, "indebtedness" without first obtaining required voter approval.

The plaintiff also contends that the statute unconstitutionally "lends the credit of the state" in violation of Article XI, section 7. He argues that the state's promise to repay the loans from "available funds" in essence is a promise that the legislature will appropriate the necessary funds each biennium. This he claims is a constitutionally impermissible pledge of the state's credit.

The defendants respond that the financing arrangements authorized by the statute do not create "debts" prohibited by the constitution because the state is not legally obligated to repay the loans beyond the amount of the current appropriations, and because future legislatures are not obligated to appropriate or otherwise make available funds for payment. The defendants assert that the state's obligation to make payments arises only in the event and to the extent of future appropriations, and that there is no recourse against the state treasury for nonpayment because any financial agreement entered into by the General Services Director is not backed by the credit of the state.

The issues to be addressed include (1) whether chapter 1032 and the implementing agreements authorize or create a "debt or liability" within the meaning of Article XI, section 7, of the Oregon Constitution and (2) whether the state's promise to make debt service payments only from available funds appropriated by the legislature impermissibly lends the state's credit.[3]

## C. STANDING

■      We must first consider whether the plaintiff has standing to initiate this proceeding.

The plaintiff is an Oregon citizen and taxpayer. He alleges that chapter 1032 "authorizes the Legislative Assembly, through the Oregon Department of General Services, to borrow unlimited amounts of money through third party lenders on the credit of the State of Oregon, with provisions for payment of principal and interest from the state's General Fund revenues commencing with the 1991-93 biennium." The plaintiff also alleges that "[t]he Legislative Assembly has appropriated funds only to repay principal and pay interest on said debt for the 1989-91 biennium," and that chapter 1032 "authorizes debt to be paid over a period of as long as 30 years in reliance on future sessions of the Legislative Assembly appropriating sufficient funds each biennium * * * to comply with the agreements made pursuant to [chapter 1032] and to avoid default and loss of the taxpayers' investments under the scheme." Moreover, "[c]ommencing with the 1991-93 biennium the Legislative Assembly will increase [plaintiff's] state taxes to repay the borrowed money and to pay the interest on the borrowed money, to be borrowed under the challenged statutory scheme." The plaintiff maintains that chapter 1032 authorizes government action in violation of the debt limitations imposed by Article XI, section 7, of the Oregon Constitution and that implementation of chapter 1032 will have a detrimental impact on his future tax obligations by forcing future legislatures to levy higher taxes or to divert state revenue in order to satisfy the state's loan obligations.

---

[3] Oregon Laws 1989, chapter 731 provides that during the 1989-91 biennium financing agreements or certificates of participation totalling $172,000,000 may be issued. The plaintiff asserts that these provisions of chapter 731 are invalid for the same reasons that chapter 1032 is invalid.

ORS 34.130 confers standing to bring a mandamus action on persons who are "beneficially interested." Standing exists if the plaintiff alleges facts that, if proved, show that his "tax burden will be augmented by the expenditure of public funds." *Hanson v. Mosser,* 247 Or 1, 11, 427 P2d 97 (1967) (*overruled on other grounds, Smith v. Cooper,* 256 Or 485, 475 P2d 78 (1970)). In *Lipscomb v. State Bd. of Higher Ed.,* 305 Or 472, 476, 753 P2d 939 (1988), we said that "the adequacy of the present complaint rests on plaintiffs' allegation that * * * the challenged [state expenditures] had cost Oregon taxpayers 'in excess of the sum of $85,000 to date, exclusive of interest, * * * and said [state expenditures] are continuing.' " The defendants in *Lipscomb,* as here, expressly did not challenge plaintiffs' standing, but they stated that standing would have to "be judged by the fiscal impact on [the plaintiffs] alleged" in the complaint. 305 Or at 475. In the present case, the attachments to the petition show that much of the $172,000,000 will be used for construction of a prison and for the purchase of equipment (neither of which will produce income), or to serve agencies receiving funds from sources other than the general fund. We infer, therefore, that general funds, obtained by taxation, will provide a large share of the $172,000,000. It is likely that if the legislature elects to appropriate funds to pay off the obligations, the funds must come, in whole or in part, from taxpayers such as the plaintiff. The plaintiff's allegations to support standing, if accepted as true, are sufficient to establish that the plaintiff likely will be exposed to future taxes by reason of the legislation. *See Morris v. City of Salem,* 179 Or 666, 679-80, 174 P2d 192 (1946). The plaintiff has met this threshold showing.[4]

### D. THE MEANING OF "DEBT" AS USED IN ARTICLE XI, SECTION 7

■ Dubbed the "pay as you go" provision by the members of the Constitutional Convention of 1857, Article XI, section 7, was adopted by the people in 1859. *See* Carey, The Oregon Constitution and Proceedings and Debates of the

---

[4] The plaintiff also asserts that he has standing because he is a citizen, *Putnam v. Norblad,* 134 Or 433, 436-37, 293 P2d 940 (1930), because he is a registered voter, citing *Butte-Silver Bow Local Govern. v. State,* 768 P2d 327, 329 (Mont 1989). The plaintiff has standing as a taxpayer. Therefore we do not reach the alternative bases for his standing claim.

Constitutional Convention of 1857 (1926). The provision limits the power of the state to create debt in excess of $50,000, except in limited circumstances. A companion provision places a $5,000 limit on the power of counties to create debt.[5]

The debates on the floor of the convention left little doubt as to the purpose of the debt limitation. The central concern was that future generations should not be saddled with the excessive undertakings of an imprudent legislature.[6] The debt limitation was therefore adopted to protect "against burdensome and excessive taxation." *McClain v. Regents of the University,* 124 Or 629, 634, 256 P 412 (1928). "[I]t was intended 'to prevent exposing the sources of public revenue to potential hazard.' Long-term obligations create a fixed charge against future revenues and can impair the flexibility of planning and the ability of future legislatures to avoid a tax increase." *Martin v. Oregon Building Authority,* 276 Or 135, 141, 554 P2d 126 (1976) (footnotes omitted).

On many occasions this court has been asked to determine whether a proposed fund-raising scheme violates the prohibitory clause of sections 7 and 10, or the like provision of a city charter. The central issue in each case was whether "debt or liabilities" had been created as that term is used in the state constitution or city charter.[7]

One of the earliest decisions defining the term "debt

---

[5] Article XI, section 10, provides:

"No county shall create any debt or liabilities which shall singly or in the aggregate, with previous debts or liabilities, exceed the sum of $5,000; provided, however, counties may incur bonded indebtedness in excess of such $5,000 limitation to carry out purposes authorized by statute, such bonded indebtedness not to exceed limits fixed by statute."

[6] In response to a suggestion that no credit limit be placed on the state and counties, Mr. Chadwick remarked: "Debts were incurred in the heyday of [a county's] prosperity by sojourners and irresponsible inhabitants, to be paid when the bubble has collapsed, by those who may come after them." Carey, The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857, 270-71 (1926).

[7] A city could intend a different meaning of "debt" or "indebtedness" from that ascribed to those terms in Article XI, sections 7 and 10. As noted in *DeFazio v. WPPSS,* 296 Or 550, 570, 679 P2d 1316 (1984): "The assumption that present charter provisions accept that interpretation of indebtedness might be overcome by showing a different intention * * *." The cases cited herein did not evidence such an intent. Most of our city charter cases have involved charter provisions that were identical or similar to the state constitution counterpart, so it is appropriate to rely on those decisions in deciding this case.

or liabilities" is *Salem Water Co. v. City of Salem,* 5 Or 29 (1873). Salem's city charter provided that "the City Council shall not in any manner create any debt or liabilities which shall singly, or in the aggregate, exceed the sum of one thousand dollars." The city of Salem contracted with a private corporation to supply water to the city for a price of $30,600 to be paid over a period of 17 years, without any provision for raising and appropriating revenue to be applied to such liabilities as they became due. In holding that this obligation constituted a "debt," this court stated:

> "The words 'any debt or liabilities,' * * * are general and may include any kind of debt or liability, either absolute or contingent, express or implied. A debt exists against the city whenever it agrees to pay money in return for services performed * * *. In a popular sense, debt includes all that is due to a party under any form of obligation or promise." 5 Or at 32.

Over the last century, as public bodies have devised various methods of avoiding constitutional or charter prohibitions, the definition of "debt or liabilities" has gained precision beyond that stated in *Salem Water Co.* This court has looked at not less than two basic characteristics in deciding whether action violates Article XI, section 7: (1) the fund from which payments on the obligation are made; and (2) the degree to which the public body is liable for repayment of the loan.

If the revenues generated from a particular project being financed are pledged for repayment, rather than revenues from general taxation, no "debt" or "indebtedness" is thereby created. *Carruthers v. Port of Astoria,* 249 Or 329, 438 P2d 725 (1968); *Butler v. City of Ashland et al.,* 113 Or 174, 232 P 655 (1925). Often referred to as the "special fund" cases, this line of decisions upholds the plan if the promise by the state is to make installment payments only from a "special [revenue] fund." Such a promise does not create a "debt" or "liabilities," within the meaning of Article XI, section 7, because general tax revenues have not been pledged. *Walsh Const. Co. v. Smith,* 272 Or 398, 537 P2d 542 (1975) (bonds issued under Housing Act to be paid only from rent revenues does not create "debt"); *Morris v. City of Salem et al.,* 179 Or 666, 174 P2d 192 (1946) (use of only parking meter revenues to pay contract obligation does not create "debt"); *McClain v. Regents of the University, supra* (construction bonds payable only from dormitory rents does not constitute "debt"); *Butler*

*v. City of Ashland et al., supra* (contract payments made only from water revenues does not create "debt").[8]

A second line of cases classifies debt based on the degree to which the public body is liable for the repayment of the obligation. *Rorick v. Dalles City,* 140 Or 342, 12 P2d 762 (1932), involved the issuance and sale of Columbia River bridge bonds by Dalles City. The authorizing statute contained a debt limitation provision similar to Article XI, section 7. Although principal on the bonds was payable only from the tolls and revenues of the bridge, the city was absolutely liable for the interest on future installments if the "special fund" was insufficient to meet the obligation. This court held that the city's contingent liability for accrued interest was a "bonded indebtedness" prohibited by the statute. 140 Or at 349-50.

A different situation was presented in *Moses v. Meier,* 148 Or 185, 35 P2d 981 (1934). The Unemployment Relief Fund Act authorized the issuance of certificates to be charged against the revenues generated under the Liquor Control Act. The state had no legal obligation to replenish the fund in the event the revenues were exhausted. The certificate holders could not look beyond the special fund for repayment. On those facts, the court ruled that the state had no liability for repayment of the loans, and that the certificates did not create "debt" in violation of Article XI, section 7. *See also McClain v. Regents of the University, supra* (when depletion of special fund does not give rise to state liability, no "debt" is created).

The inclusion of a clause permitting the legislature to compensate for any deficiencies in the obligation payments out of the general funds if it so chooses — called a "moral make-up clause" — does not change the result. In *Walsh Const. Co. v. Smith, supra,* the constitutionality of the Oregon Housing Act was challenged. The act authorized, but did not require, future legislatures to supplement the reserve account from which loan payments were drawn with general revenues

---

[8] The state may not circumvent the protective barriers placed around the general tax revenues by levying special taxes to create the special fund. *Brix v. Clatsop County,* 46 Or 223, 80 P 650 (1905).

when that account became depleted.[9] The court upheld the act because the "moral make-up" clause, at most, gave rise to a moral obligation, but in no event were future legislatures legally obligated to replenish the account. 272 Or at 404.[10]

The drafters of the constitution intended that the state pay as it goes. An unconditional promise to pay is invalid if payment is to be made, in whole or in part, from future appropriations out of the general tax fund. Over the years a variety of schemes have been devised to permit the State of Oregon or Oregon local governments to acquire assets with funds not then in being, so to speak. Some have been upheld. Some have not. But one rule of law has remained steadfast throughout: The term "debt" as used in Article XI, section 7, means an unconditional and legal obligation of the state to pay, when at the time the obligations initially are created there are insufficient unappropriated and not otherwise obligated funds in the state treasury to meet those obligations.

## E. CHAPTER 1032 DOES NOT VIOLATE ARTICLE XI, SECTION 7.

The main provisions of chapter 1032 are set forth in Part A above. The statute itself authorizes at least some forms of financing agreements that would not expose the state to future legally enforceable financial burdens and therefore would not be "debts" in the constitutional sense. The statute therefore is not unconstitutional. This does not mean that particular agreements that might be undertaken under the statute would not create a debt or liability forbidden by Article XI, section 7.

Chapter 1032 states that the Director of the Department of General Services can "[e]nter into agreements * * * and issue certificates of participation in the right to receive payments due from the state under a financing agreement." The proposed agreements are in the record before us. They

---

[9] Section 7 of chapter 1032 contains a similar provision. It requires the Governor to recommend to the legislature "the total level * * * for which general obligation or revenue bonds or certificates of participation or other financing agreements are authorized." But it does not require the legislature to accept the Governor's recommendation.

[10] Note also that a future governor has the power to veto legislation appropriating funds to pay a moral obligation.

repeatedly recite that the state's obligation to pay is limited. We quote some of the provisions.

The fifth paragraph of the certificate of participation states:

"The obligation of the Borrower to pay Loan Payments does not constitute an obligation of the Borrower or the State for which the Borrower or the State are obligated to levy or pledge any form of taxation or for which the Borrower or the State has levied or pledged any form of taxation. Neither the Certificates nor the obligation of the Borrower or the State to pay Loan Payments under the Loan Agreements constitute a pledge of the faith and credit of the State or a debt of the State or any of its political subdivisions within the meaning of the Constitution of the State of Oregon or within the meaning of any statutory debt limitation or restriction."

The second paragraph of the "Security for the Certificates" section of the certificate of participation states:

"Covenants to Allot and Collect. The Executive Department of the State and the Borrower have covenanted in the Loan Agreements to use their best efforts to cause the State Legislature to appropriate, allot and encumber to and for the proper parties sufficient money to permit the Loan Payments and Additional Charges due under the Loan Agreements. The Loan Agreements are subject to termination during any fiscal period if the State Legislature does not appropriate funds sufficient for its continuation. The State Legislature is under no obligation to make any appropriation with respect to the Loan Agreements. There is no right to accelerate the payment of any Loan Payment under the Loan Agreements."

The next paragraph repeats the fifth paragraph of the certificate of participation.

The "Loan Payments; Additional Charges" section iterates:

"The Loan Payments are payable solely from available funds.

"The obligation of the State to make Loan Payments under the Loan Agreement is subject to the possibility that the State Legislature may fail to allot sufficient funds for such Loan Payments."

Section 6.6 of the Loan Agreement states:

"*Nonappropriation.* Except as provided in the following

sentence, in the event that the Oregon Legislature allots insufficient funds for the remainder of the then current fiscal period or for a succeeding fiscal period or portion thereof by appropriation, appropriation limitation or grant, to continue payments under this Agreement and the Borrower has no other funding source lawfully available to it for such purpose, the obligation of the State to make the Loan Payments from money available to it shall terminate on the date on which, under the terms of the appropriation, appropriation limitation or grant, moneys will no longer be allotted for this Agreement without penalty, and such termination shall not constitute an event of default hereunder or under the Trust Agreement. The obligation of the State to make Loan Payments shall thereafter continue, but only to the extent of money available to the Trustee under the Trust Agreement. Except as provided in the preceding sentence, all payment obligations of the State hereunder for the remainder of such current fiscal period or such succeeding fiscal period, as the case may be, shall end as of such termination."

Other sections of the agreements repeat these glum assurances.

The chapter 1032 promise to pay is different from that made in *Martin v. Oregon Building Authority, supra. Martin* involved a scheme whereby the Building Authority, acting as an intermediary between the state and the lenders, would borrow funds to finance the construction of public buildings. The Building Authority made an unconditional promise to repay the loans with revenue from the lease or sale of such buildings. The Building Authority thereafter leased the buildings to the state, the rent being equal to the debt service on the loans, plus operating costs. The court held that the Building Authority was nothing more than a "gutless intermediary," 276 Or at 145, and that the Building Authority and the state were, for all intents and purposes, one and the same. Thus, the loans to the Building Authority were loans to the state, and the Building Authority's unconditional promise to repay the loans was actually an unconditional promise by the state to repay the loans. In addition, the court held that "the state is unconditionally obligated to pay rent * * * notwithstanding the acts of the Authority." 276 Or at 152.

Chapter 1032 and the proposed agreements make explicit and clear that the state has no obligation to make payments beyond the amount of any current appropriation.

Section 2(1) begins: "Amounts payable * * * shall be limited to available funds." The second sentence of Section 2(1) further provides: "In no circumstance shall the state be obligated to pay amounts due under a financing agreement from any source other than available funds."[11]

The state's promise of repayment is conditioned on the willingness of future legislative assemblies to appropriate the funds. The state does not promise that future legislatures will appropriate any funds. The lenders take the risk of non-payment. This aspect of the legislation does not create "a fixed charge against future revenues," nor does it "impair the flexibility of planning and the ability of future legislatures to avoid a tax increase." *Martin v. Oregon Building Authority, supra,* 276 Or at 141. On the contrary, under chapter 1032 a future legislature is bound only by its collective conscience. As noted in *Walsh Const. Co. v. Smith, supra,* 272 Or at 404, if the legislature makes an unenforceable promise to replenish the source from which repayments are made, "it is at most based upon a moral obligation which the members of future legislatures might feel to meet the deficiency. We do not interpret Article XI, section 7, as prohibiting such a moral and therefore unenforceable pledge."

Nor does the fact that the legislature may feel compelled to make payments in a future biennium out of the fiscal concern to protect its credit rating convert the state's "obligation" into a legal one subject to Article XI. The economic and fiscal consequences of either continuing the agreements or

---

[11] Section 3(8) of chapter 1032 allows the Director of the Department of General Services to bill any state agency which "benefits from property acquired with the proceeds of a financing agreement for an appropriate share of the financing costs, including debt service" and requires the agency to pay the amount billed "from the first amounts legally available to it." We interpret this subsection to be limited to the agency for which property is obtained or constructed with the proceeds from the agreement. We understand the words "legally available to it" to be synonymous with "available funds." We interpret the part of the definition of "available funds" which provides "or otherwise made available by the Legislative Assembly" to be similarly limited to funds which the legislature has explicitly designated for repayment of the financing agreement proceeds. As interpreted, available funds would not include funds derived under the continuing statutory authority of the Director to assess agencies for various purposes. These statutory assessment provisions, which we understand are excluded from Section 3(8) and from "available funds," are self-executing and are usually implemented by continuing appropriation statutes requiring no further action by the legislature to place the funds at the Director's disposal. *See, e.g.,* ORS 276.005, 276.013, 276.385, 276.412, 283.075.

allowing them to terminate by failing to appropriate money merely becomes a factor in the public policy calculus of a political system that automatically "subjects the economic wisdom of such projects to [biennial] review by future taxpayers and their elected representatives." Note, *State and Municipal Lease-Purchase Agreements: A Reassessment,* 7 Harv J L & Pub Pol'y 521, 547 (1985). These consequences are of no constitutional significance.

Our decision today finds good company with the decisions of other high courts. Though decisions of other states are not binding, most sister courts considering the effect of nonappropriation clauses have upheld financing mechanisms such as this because the nonappropriation mechanism prevents the transaction from being a "debt" under state law.[12]

However, there is one significant exception to our holding that chapter 1032 and the agreements thereunder do not impermissibly create "debt or liabilities," an exception arising from the remedies available to the certificate holders upon nonpayment.

## F. THE MEANING OF "LIABILITIES" AS USED IN ARTICLE XI, SECTION 7

Chapter 1032 would permit at least three types of acquisitions:

1. The acquisition of personal property such as computer hardware and software, equipment, and furnishings for state buildings. Section 3(6) of chapter 1032 provides for the granting of security interests "on the date the state takes

---

[12] *State ex rel. W. Va. Res. Recovery v. Gill,* 323 SE2d 590 (W Va 1984); *Glennon Heights, Inc. v. Central Bank & Trust,* 658 P2d 872 (Colo 1983); *Enourato v. N.J. Building Auth.,* 182 NJ Super 58, 440 A2d 42 (1981) *aff'd* 448 A2d 449 (1982); *Edgerly v. Honeywell Information Systems, Inc.,* 377 A2d 104 (Me 1977); *Ruge v. State,* 201 Neb 391, 267 NW2d 748 (1978); *McFarland v. Barron,* 164 NW2d 607 (SD 1969); *State v. Giessel,* 271 Wis 15, 72 NW2d 577 (1955); *Texas Nat. Guard Armory Board v. McCraw,* 126 SW2d 627 (Tex 1939). *But see Witzenburger v. State ex rel. Wyo., etc.,* 575 P2d 1100, *reh'g denied, Witzenburger v. State ex rel. Wyo.,* 577 P2d 1386 (Wyo 1978).

See these articles for a discussion of recent state and local government financing legislation concerning lease-purchase agreements and nonappropriation clauses: 1 Gelfand, *State & Local Government Debt Financing,* ch 3-4 (1987); Note, *State and Municipal Lease-Purchase Agreements: A Reassessment,* 7 Harv J L & Pub Pol'y 521-550 (1984); and Petersen, *Creative Capital Financing in the State and Local Sector,* Public Budgeting & Finance 73-89 (Winter 1982).

possession of the personal property, or the date the lender advances money." Upon nonpayment, the secured party has "the rights and remedies available to a secured party under ORS 79.1010 to 79.5070 * * *."

2. The acquisition of land. Section 3(5) allows the state to use acquired property as security for repayment. Upon nonpayment by the state, the trustee may. exclude the state from the property for the remaining portion of the lease and sublease the land to third parties.

3. The construction of improvements on real property acquired with borrowed funds or on land presently owned by the state. Section 3(5) applies to this form of acquisition as well. Upon nonpayment by the state, the Trustee, acting on behalf of the certificate holders, may exclude the state from the property for the remainder of the lease term and sublease the property.

Section 3(5) provides that the state may

"grant leases of real property with a trustee or lender. Such leases may be for a term which ends on the date on which all amounts due under a financing agreement have been paid or provision for payment has been made, or 10 years after the last scheduled payment under a financing agreement, whichever is later. Such leases may grant the trustee or lender the right to evict the state and exclude it from possession of the real property for the term of the lease if the state fails to pay when due the amounts scheduled to be paid under a financing agrement or otherwise defaults under a financing agreement. Upon default, the trustee or lender may sublease the land to third parties and apply any rentals toward payments scheduled to be made under a financing agreement."

Though this language is not as clear as it might be, we interpret Section 3(5) to mean that the state would lease the real property to the trustee or lender and take a lease-back. On nonpayment, the trustee or lender could take possession of the land and any improvements constructed thereon for the unexpired term of the lease and sublease the property to third persons.[13] At the conclusion of the term of the lease, the prop-

---

[13] The certificate of participation contains this statement concerning remedies on default.

"Lien on Project. Although the Loan Agreement grants the Lender certain rights with respect to the Projects, the rights may be difficult or impossible to

erty, including the improvements, would return to the state. The loan agreements state that "the real property lease constitutes the sole security for the capital certificates * * *."

Do these proposed agreements create actual or potential "liabilities" within the meaning of Article XI, section 7? We turn again to the meaning that this court has given Article XI, section 7, in light of its purpose. A financing agreement may violate Article XI, section 7, if it presently commits the state to an expenditure which may in the future exceed the special source of funds, if any, that is committed to pay for it. *Rorick v. Dalles City, supra.* Thus the question is whether a provision for relinquishing a state-owned asset in case future funding does not meet the state's commitment constitutes a contingent future liability or a present transfer of a contingent interest in an existing asset. For this purpose, it is immaterial whether the encumbered asset is the asset that is purchased with the borrowed funds or another asset already owned by the state.

A common "lease-purchase" agreement generally allows the lessee to terminate the transaction without further liability if the lessee no longer needs, wants, or can afford the leased property. This does not create a "debt or liability."[14] The situation is more questionable if, upon terminating the agreement, the state stands to lose more than what remains to be paid on the acquired property, for instance, if most of the agreed price of an outright purchase, including interest, has been paid but termination will cause the state's entire valuable property (worth more than the unpaid balance) to pass into the hands of the seller or lender. In that situation, the agreement confronts future legislators with the choice between the financial cost of continued cash payments or the financial cost of losing valuable nonmonetary property. This

---

enforce, and the Projects are not expected to have significant value to anyone except the State. No representation is made to the Owners of the Certificates that the Lender or Trustee could successfully foreclose the lien on either Project, or that, if the lien were foreclosed, either Project would have significant value."

We are not interpreting the quoted provision but having mentioned it, point out that chapter 1032, as to real property, does not expressly provide for lien security or for "foreclosure."

[14] *See* cases cited in Note, *supra* note 12, at 523-24, 529-32. *See also* 15 McQuillen, The Law of Municipal Corporations 402, § 41.16 (1985).

contingency may appear to create a "liability," prohibited by Article XI, section 7.

The constitution prohibits "debt or liabilities." Granting a security interest in land or personal property owned by the state creates a contingent future liability — the loss of property or loss of use of the property — a liability that might well be substantial. To the extent that the state stands to lose property or lose the use of property, in an amount in excess of the unpaid balance, even if only for the unexpired term of a real property lease, a contract may violate Article XI, section 7. This is best made clear by including such provisions in the contracts — that the security interests granted by the state are valid to the extent, and only to the extent, of the unpaid balance under the contracts. The trustee or lender can recover, upon the exercise of rights granted in the agreements, no more than the amounts unpaid under the agreements at the time of "foreclosure" for nonpayment.

Although chapter 1032 is not unconstitutional, it might be applied in an unconstitutional manner. If we attempted to anticipate and resolve all the variations possible under the statute at this time, we would stray into giving an advisory opinion. It is impossible to predict whether in fact the proposed agreements will put the successors of current legislators and taxpayers at risk to lose more than the remaining unpaid balance under the agreements. These agreements or amended agreements need not do so, for the answer may turn on unpredictable fluctuations in the price of construction or acquisition or on the values of owned or leased property. We therefore hold no more than that the participation agreements are not on their face forbidden as a future "debt or liability" contrary to Article XI, section 7, so long as the state stands to lose property or the use of property worth no more than the unpaid balance under the agreement.

## G. LENDING THE CREDIT OF THE STATE

Article XI, section 7, also prohibits the Legislative Assembly from "lending the credit of the state" exceeding $50,000.[15] *DeFazio v. WPPSS*, 296 Or 550, 577, 679 P2d 1316 (1984), discusses the meaning of "lending credit":

---

[15] Article XI, section 9, places similar limitations on the power of counties or cities to assist corporations by "loaning its credit."

"Past opinions discussing these constitutional provisions include some cases in which the government became a co-owner of property or borrowed funds to aid a private enterprise in a desired economic development. *See Miles v. City of Eugene,* 252 Or 528, 451 P2d 59 (1969) (joint construction of power plant); *Carruthers v. Port of Astoria, supra* (municipal financing of aluminum reduction plant for long-term lease to specified private company); *Hunter v. Roseburg,* 80 Or 588, 156 P 267, 157 P 1065 (1916) (municipal bonds for joint railroad project with railroad company and lumber company). These more properly illustrate 'raising money' than 'lending credit.' By forbidding the state to 'lend' and local governments to 'loan' their credit, as well as to hold stock in or raise money for a corporation, Article XI covers transactions in which government does not itself raise and transfer funds but places its credit behind the corporation's ability to borrow money or obtain goods on credit. The obvious example is an outright guarantee made directly to a creditor to pay another's debt."

To "lend the credit of the state" is to invest or otherwise promise public funds for the benefit of private persons or to promote private schemes. *Morris v. City of Salem et al., supra,* 179 Or at 671; *McMahan v. Olcott,* 65 Or 537, 542-43, 133 P 836 (1913). No such situation exists here. Chapter 1032 limits use of the financing agreements to "real or personal property which is or will be owned and operated by the state or any of its agencies, or to refinance previously executed financing agreements." (Section 1(4).)

### Conclusion

In sum, chapter 1032 is constitutional. We cannot say that the proposed agreements are in violation of Article XI, section 7. The alternative writ of mandamus therefore is dismissed.